IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:17-CV-00052-RN

**Donna Edwards,**

Plaintiff,

v.

**Commissioner of Social Security,**[1]

Defendant.

**Memorandum & Order**

Plaintiff Donna Edwards instituted this action in March 2017, to challenge the denial of her application for social security income. Edwards claims that Administrative Law Judge ("ALJ") Carl B. Watson improperly evaluated the medical opinion evidence and applied the incorrect Medical-Vocational Guidelines ("Grid Rule") on the way to his determination that she was not disabled. Both Edwards and Defendant, the Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 21, 25.

After reviewing the parties' arguments, the court has determined that ALJ Watson erred in his determination. It is appropriate to remand this matter because of ALJ Watsons's failure to obtain disability paperwork from one of Edwards's providers as directed by the Appeals Council. The information in disability paperwork could influence the ALJ's consideration of, and assignment of weight to, the medical opinions. And it is also appropriate to remand this matter

---

[1]  The initial pleadings named Nancy Berryhill as the defendant in her role as Acting Commissioner of Social Security. Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017. Under the Vacancies Reform Act of 1998, her term of Acting Commissioner expired on November 17, 2017. 5 U.S.C. § 3346(a). To date, the President has not named a replacement for Berryhill.  Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is DIRECTED to identify Defendant by the official title rather than by name.

because the ALJ did not adequately discuss the effect of the fact that Edwards was close to reaching an older age category under the Grid Rules on her potential disability. The court therefore grants Edwards's motion, denies the Commissioner's motion, and remands the matter to the Commissioner for further consideration.[2]

## I. Background

Edwards protectively filed applications for disability insurance benefits and supplemental security income. In both applications, she alleged that she suffered from a disability that began in May 2010. After her claims were denied at the initial level and upon reconsideration, Edwards appeared before ALJ Watson for a hearing to determine whether she was entitled to benefits. ALJ Watson determined Edwards was not entitled to benefits because she was not disabled. Tr. at 134–42.

ALJ Watson held a second hearing after the Appeals Council remanded the matter for consideration of additional evidence. Tr. at 18.

After the second hearing, ALJ Watson found that Edwards had several severe impairments: post infection intercostal neuralgia, neuropathic pain syndrome, pulmonary hypertension, right renal cyst and abdominal pain, diabetes, hernia, and obesity. Tr. at 21. He also found that Edwards's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 23.

According to the ALJ, Edwards had the RFC to perform a range of light work with additional limitations. Tr. at 25. She cannot climb ladders, ropes, or scaffolds but she can occasionally climb ramps and stairs. *Id.* Edwards must also avoid working at unprotected heights. *Id.*

---

[2] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). 28 U.S.C. § 636(b). D.E. 17.

ALJ Watson concluded that Edwards cannot perform her past work as a chemical mixer, electrical motor assembler, machine operator, or cutting machine operator. Tr. at 34. But he determined that, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Edwards was capable of performing. Tr. at 35. These include ticket seller, check room attendant, and hand presser. *Id.* Thus, ALJ Watson found that Edwards was not disabled. Tr. at 36.

After unsuccessfully seeking review by the Appeals Council, Edwards began this action in March 2017. D.E. 5.

## II.     Analysis

### A.     Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to determining whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.     Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson* v. *Barnhart*, 434 F.3d 650 (4th Cir. 2005). The ALJ must consider the factors in order. At step one, if the claimant is engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a

severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. But if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.     Medical Background

#### 1.     Medical Records

Edwards began experiencing stabbing chest pain in 2011. Tr. at 26. In February 2011, Edwards spent a week in the hospital because of her symptoms. Tr. at 27. Upon discharge, providers assessed her with atypical chest pain after a recent viral illness. *Id.* Her presentation was most consistent with costochondritis. *Id.* Two months later, David Richardson, FNP-C, under the supervision of Dr. Aymen Gebrail, released Edwards to part-time work for four hours per day and imposed a ten-pound lifting restriction. *Id.*

Providers at Duke Hospital saw Edwards in May 2011 for management of her chronic sternal pain, after she had a respiratory infection accompanied by a persistent cough. *Id.* Edwards received a diagnosis of intercostal neuralgia, costochondritis, and neuropathic pain syndrome. *Id.* Nerve blocks provided temporary relief of her symptoms. *Id.*

In the following months, treatment records from Edwards's primary care providers at Costal Internal Medicine reflect that she continued to complain of chest wall pain, shortness of breath, weakness, and back pain. *Id.* She reported difficulty lifting, carrying, standing, walking, bending, and climbing stairs. *Id.* She also had to shift positions while seated. *Id.* Records reflect that Edwards was unable to pursue regular treatment because she lacked health insurance. *Id.* Providers advised Edwards to pursue employment to obtain insurance coverage which would enable her to return to pain management. *Id.*

In June 2011, Teresa Baughman, a caseworker with the Department of Social Services, stated that Edwards had trouble breathing and sitting still, and also noted that she appeared to be in significant pain. Tr. at 28.

State agency medical consultant Dr. Edward Woods evaluated Edwards's records in December 2011. Tr. at 33. He opined that she was capable of light work with restrictions to frequent balancing and frequent climbing of ramps, stairs, ladders, ropes, and scaffolds. *Id.* He also concluded that Edwards should avoid moderate exposure to pulmonary irritants and concentrated exposure to hazards. *Id.*

The next month, state agency consultant Dr. Bertron Haywood reviewed Edwards's records. *Id.* He determined that she could perform light work with frequent climbing of ramps and stairs but only occasional climbing of ladders, ropes, or scaffolds. *Id.* Like Dr. Woods, Dr. Haywood found that Edwards should avoid concentrated exposure to hazards. *Id.*

Around this same time, Edwards underwent a consultative psychological examination with C. Craig Farmer, Ph.D. Tr. at 22. He noted that she had low mood but full orientation and clear thought processes. *Id.* He opined that Edwards could understand, retain, and follow instructions and that she had an adequate ability to relate to others. *Id.* Dr. Farmer concluded that

her abilities to sustain attention for simple, repetitive tasks and to tolerate stress may be limited because of her chronic pain. *Id.*

State agency consultant Jennifer Fulmer, Ph.D., also assessed Edwards's mental abilities. *Id.* Dr. Fulmer opined that she had the ability to perform simple, routine, repetitive tasks in a low-production setting. *Id.*

Edwards spent two days in the hospital in February 2012 because of her chronic chest pain. Tr. at 33. Providers ruled out a cardiac event and considered her symptoms to be neuropathic. Tr. at 28. Her follow-up treatment records reflect unremarkable physical examinations, aside from ongoing chest pain. *Id.* Richardson remarked that cortisone injections helped address Edwards's pain, but she could not continue to afford the injections. *Id.*

In March 2012, after Edwards sought emergency treatment for chest pain which she rated as ten out of ten, providers prescribed her various medications. *Id.* Edwards also had an MRI of her abdomen, which did not identify a cause for her abdominal pain. *Id.*

In August 2012, Edwards underwent a cardiac evaluation and rated her chest pain as a six out of ten. Tr. at 28. Three months later, Edwards told providers that her chronic chest pain had curtailed any leisure activities. Tr. at 29. She reported some relief from using a heating pad and lying on her side. *Id.* Providers believed Edwards suffered from chronic pain syndrome and aortic valve disorder, status post-replacement. *Id.*

Edwards also returned to the pain management clinic in August 2012 for the first time in 18 months. *Id.* She reported that her medications provided no relief from her pain. *Id.* Providers noted that she appeared uncomfortable and that she rated her pain as eight out of ten. *Id.* An examination showed normal gait but tenderness to palpitation in the sternum and medial scapular areas. *Id.* Providers diagnosed her with myofascial pain syndrome, musculoskeletal pain, and

costochondritis. *Id.* Providers administered a trigger point injection and advised Edwards to increase her medication, but they recommended no further treatment. *Id.* Accordingly, the pain management clinic discharged Edwards with minimal objective findings. *Id.*

Two months later, after increasing the amount of medication she was taking, Edwards described her pain as less severe, although she was experiencing some dizziness and nausea. *Id.*

In March 2013, Richardson saw Edwards to complete disability paperwork. *Id.* He observed that financial issues had prevented her from following up with his office for over a year. *Id.* Edwards reported chest pain and difficulty with postural movements. *Id.* Upon examination, Richardson noted tenderness to palpitation in the chest and spine and limited left shoulder range of motion. *Id.* He concluded that Edwards would have trouble working. *Id.*

Three months later, Edwards sought emergency treatment for chest pain and abdominal discomfort. Tr. at 30. A CT scan showed a benign right kidney cyst but testing failed to identify a source of her abdominal symptoms. *Id.* Edwards returned to the emergency department a week later for severe abdominal pain and vomiting. *Id.* After assessing her with Gastritis, providers adjusted her medication regimen. *Id.*

Edwards saw Richardson again three months later requesting pain management treatment. *Id.* She reported that intermittent hydrocodone provided relief of her pain. *Id.* An examination showed chest pain, which increased with palpitation and range of motion. Richardson remarked that both conservative measures and advanced pain options had failed. *Id.* He prescribed additional medications. *Id.* When Edwards returned to Richardson's office for refills, she stated that a one month supply lasted her two months. *Id.*

Edwards followed-up with her cardiologist in November 2013. *Id.* An examination showed an unstable gait and providers noted a flat affect. Tr. at 30–31. The provider assessed chronic pain syndrome; aortic valve disorder, status post replacement; and depression. Tr. at 31.

Edwards returned to Richardson the next month for treatment of a lumbar strain, for which she was using a cane. *Id.* Providers increased and refilled her medications. *Id.* When Edwards followed-up in March 2014, she reported that she stopped taking one medication because of dizziness, which then improved. *Id.* Edwards reported continued difficulty with postural maneuvers but providers assessed her pain management as stable. *Id.*

In June 2014, at a cardiology follow up appointment, providers noted no acute findings or change Edwards's medication regimen. *Id.* Later that month, however, Edwards sought emergency treatment for chest pain and abdominal pain with vomiting. *Id.* Again, providers made no acute findings and discharged her after she displayed some improvement in her symptoms. *Id.*

The next month, Edwards returned to Richardson for follow-up care. *Id.* He noted that her chronic pain was stable on her current medication. *Id.* An examination revealed sternal chest pain, left knee pain, and lumbar back pain. *Id.* Treatment records also noted that Edwards used a cane and had a stable gait. *Id.* Providers decreased her medication regimen to alleviate her nausea and epigastric symptoms. *Id.*

In September 2014, Edwards again sought emergency treatment for chest pain and epigastric pain. *Id.* Imaging studies showed a benign right renal cyst but were otherwise unremarkable. *Id.* When Edwards followed-up with her treating provider later that month, she reported that some symptoms had resolved but that she continued to experience chronic epigastric tenderness. *Id.*

The month after, Edwards sought gastroenterological treatment for chronic nausea and epigastric pain, which providers suspected related to her use of opioids. *Id.* One month later, Edwards reported to Richardson that her symptoms had improved since reducing her opioid regimen. Tr. at 32. An abdominal ultrasound later that month showed multiple renal cysts but was otherwise unremarkable. *Id.* At a gastroenterology follow-up visit in December 2014, providers advised Edwards that her nausea and abdominal pain were likely secondary to her chronic opiate use. *Id.*

At a return visit to Richardson in December 2014, Edwards reported new and different chest pain, which providers believed stemmed from gastrointestinal issues. *Id.* Providers advised Edwards to continue decreasing her medication. *Id.* Treatment records in the following months reflect generally routine care and conservative treatment. *Id.* They also note that Edwards was unwilling to continue to reduce her use of pain medications that caused her gastrointestinal symptoms. *Id.*

Richardson's March 2015 records note Edwards's history of chronic chest pain which limited her postural movements. *Id.* They also reflect her use of a cane because of knee pain. *Id.* Richardson again completed disability paperwork for Edwards the next month. *Id.*

### 2. Hearing Testimony

At the May 2013 hearing, Edwards testified that she had experienced chest pain since 2011. Tr. at 26. She stated that she was advised to get a cane which she used to keep from falling. *Id.* Edwards estimated she could stand for 15 minutes and sit for two hours at a time, and walk 30 to 40 yards before needing to lie down. *Id.* She claimed that her providers directed her not to lift more than ten pounds. *Id.*

At the second hearing two years later, Edwards testified that her condition had worsened. *Id.* She stated that her pain was so severe that she stayed in bed. *Id.* Edwards remarked that her medications made her drowsy and caused stomach problems but provided some relief of her symptoms. *Id.* She could care for her personal needs and do housework, but stated that it was difficult. *Id.* Edwards could drive when she was not taking pain medication. *Id.* She attended church and visited family members. *Id.*

### D.    Medical Opinion Evidence

Edwards contends that ALJ Watson should have given more weight to the opinions of her treating physicians. She also maintains that ALJ Watson disregarded the Appeals Court's directive that he obtain a March 2013 disability statement from Edwards's treating provider. The Commissioner claims that substantial evidence supports ALJ Watson's consideration of the medical opinion evidence. The court finds that ALJ Watson must revisit his evaluation and weighing of this evidence.

### 1.    Richardson's March 2013 Statement

In its remand order, the Appeals Council directed that the ALJ consider Richardson's April 13, 2011 opinion that Edwards could work four hours per day with a restriction on lifting no more than ten pounds. Tr. at 148. Richardson referenced that he had completed "disability paperwork" in March 2013 and suggested that Edwards continued to have the limitations stated in that paperwork. *Id.* The Appeals Council noted that the record did not appear to include this evidence and that "development is needed to obtain" the March 2013 statement. *Id.*

At the second hearing, ALJ Watson discussed Richardson's March 18, 2013 disability paperwork with Edwards's non-attorney representative. Tr. at 46–48. He noted that the record contained Richardson's treatment note from that visit, which stated that Richardson had

completed Edwards's disability paperwork that day. Tr. at 47, 712. But, as the Appeals Council noted, the disability paperwork Richardson referenced did not appear to be part of the record. Tr. at 148. ALJ Watson's said that he would hold the record open for 30 days to allow Edwards's representative to submit the disability paperwork. Tr. at 48. It appears that neither Edwards nor her non-attorney representative submitted the relevant documents to the ALJ. The question here is whether it was Edwards's responsibility to obtain the information or whether the Appeals Counsel's instruction obligated the ALJ to do it.

A review of the Social Security Administration's regulations show that the Appeals Counsel's statement required the ALJ to try to obtain the disability paperwork. The regulations use the term "development" to discuss the Administration's affirmative responsibility to assist a claimant to obtain medical records. 20 C.F.R. 404.1512(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application…"). The development process requires the administration to "make an initial request for evidence from [the claimant's] medical source" and then, if the source is non-responsive, "make one follow-up request to obtain the medical evidence necessary to make a determination." *Id.* § 404.1512(b)(1)(i). Development is distinguished from the claimant's general responsibility to provide documents and information to the Administration. *Id.* §404.1512(a). Thus, the Appeals Counsel's use of the term "development" required the ALJ to take affirmative steps to obtain the March 2013 paperwork.

This conclusion is reinforced by the requirements that the Fourth Circuit has placed on ALJs when confronted with pro se parties. A pro se claimant is "entitled to the sympathetic assistance of the ALJ to develop the record[.]" *Crider* v. *Harris*, 624 F.2d 15, 16 (4th Cir. 1980). In cases involving an unrepresented party, an ALJ has a heightened duty to "assume a more

active role in helping claimants develop the record." *Sims* v. *Harris*, 631 F.2d 26, 28 (4th Cir. 1980). Given Edwards's pro se status, the ALJ should have proactively assisted her in obtaining the disability paperwork.

But an ALJ's failure to adequately develop the record warrants remand only where the failure results in prejudice or unfairness to the claimant. *Id.* at 28; *see also Brown* v. *Shalala*, 44 F.3d 931, 935 (11th Cir. 1995); *Mann* v. *Astrue*, No. 5:07–201, 2008 WL 906346, at *17 (S.D.W. Va. Mar. 31, 2008). Thus, remand may not be warranted "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey* v. *Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (citations omitted); *Roseberry* v. *Colvin,* Case No. 3:15-cv-04895, 2016 WL 1737121, at *14 (S.D.W. Va. May 2, 2016).

The Appeals Council's order establishes that the disability paperwork is material to the disability determination. The ALJ's failure to evaluate Richardson's medical opinion was one of the reasons the Appeals Counsel vacated the initial opinion. Tr. at 148. That the Appeals Counsel felt that it was necessary for the ALJ to obtain the disability paperwork as part of the evaluation of Richardson's opinion proves the paperwork's' materiality. *Id.* Thus, ALJ Watson's failure to obtain the disability paperwork (or, at least, to try to do so) was improper and prejudicial to Edwards's claim.

It may be that that "disability paperwork" does not exist or is no longer available.[3] But given the Appeals Council's determination that the ALJ should obtain this evidence to allow for a fair consideration of Edwards's claim, ALJ Watson's failure to request it from Richardson

---

[3] ALJ Watson's decision noted that additional evidence was received from Richardson after the hearing. Tr. at 33. But it is unknown if this evidence was specifically requested, and the submissions do not appear to include "disability paperwork" nor a statement from Richardson that no such disability paperwork available for submission.

constituted reversible error. Thus, it is appropriate to remand this matter to the ALJ so that he may request Richardson's March 2013 disability paperwork and consider it as part of his evaluation of Edwards's claims.

### 2.    Weight Assigned to Medical Opinions

Edwards also contends that ALJ Watson should have given more weight to Baughman's statement and the opinions from Richardson and Drs. Farmer and Fulmer. The Commissioner maintains that substantial evidence supports the ALJ's consideration of this evidence. The court cannot conclude, at this point, that ALJ Watson's weighing of the medical evidence has the support of substantial evidence, given that remand for further consideration of additional evidence is supported given the discussion above.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson* v. *Comm'r of Soc. Sec.*, 600 F. Supp. 2d 740, 752 (W.D. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

An ALJ must give controlling weight to the opinions of treating physicians and psychologists on the nature and severity of impairments if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Craig* v.

*Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *Ward* v. *Chater*, 924 F. Supp. 53, 55–56 (W.D. Va. 1996); SSR 96–2p, 1996 WL 374188 (July 2, 1996). Otherwise, the ALJ should give the opinions much less weight. *Craig*, 76 F.3d at 590. In determining the weight to give to an opinion, the ALJ should consider the length and nature of the treating relationship, the supportability of the opinions, their consistency with the record, any specialization of the source of the opinions, and other factors that tend to support or contradict the opinions. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Ashmore* v. *Colvin*, No. 0:11–2865-TMC, 2013 WL 837643, at *2 (D.S.C. Mar. 6, 2013) ("In doing so [i.e., giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

An ALJ cannot give controlling weight to opinions from "other sources" who do not qualify as acceptable medical sources, but the ALJ should evaluate them under the same factors used to weigh the assessments of physicians and psychologists. SSR 06–03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006); *see also* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (identifying "other sources"). An ALJ must explain the weight given to opinions of "other sources" and the reasons for the weight given. SSR 06–03p, 2006 WL 2329939, at *6; *Napier* v. *Astrue*, No. TJS-12–1096, 2013 WL 1856469, at *2 (D. Md. May 1, 2013).

Similarly, an ALJ should consider evaluations from sources who neither treat nor examine a claimant under the same basic standards as evaluations of medical opinions from treating providers whose assessments the ALJ does not give controlling weight. *See* 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). The ALJ must explain the weight given to these opinions. *Id.*; *Casey* v. *Colvin*, No. 4:14-cv-00004, 2015 WL 1810173, at *3 (W.D. Va. Mar. 12, 2015), *adopted by*, 2015 WL 1810173, at *1 (Apr. 21, 2015); *Napier*, 2013 WL 1856469, at *2.

An ALJ should generally give more weight to the opinion of a treating source over the opinion of a non-treating examining source. Similarly, the opinion of an examining source typically receives more weight than the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(c)(1), (2), 416.927(c)(1), (2). Under appropriate circumstances, however, the opinions of a non-treating examining source or a non-examining source may be given more weight than those of a treating source. *See, e.g., Mastro* v. *Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (affirming ALJ's attribution of greater weight to the opinions of a non-treating examining physician than to those of a treating physician); SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Opinions from medical sources on issues reserved to the Commissioner, such as disability, are not entitled to any special weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96–5p, 1996 WL 374183, at *2, 5 (July 2, 1996). But the ALJ must still evaluate these opinions and give them appropriate weight. SSR 96–5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator must evaluate all evidence in the case record that may have a bearing on the determination or

decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

ALJ Watson afforded little weight to Dr. Farmer's conclusion about the effects of that Edwards's chronic pain on her mental functioning. Tr. at 22.[4] He reasoned that as a psychologist, Dr. Farmer is not a medical doctor and did not assess the severity of Edwards's pain. *Id.*

Similarly, ALJ Watson afforded little weight to Dr. Fulmer's assessment, finding that it was based on Dr. Farmer's opinion, which he found inconsistent with the record. *Id.*

The ALJ's explanation regarding the weight given to Drs. Farmer and Fulmer's opinions is unsupported by substantial evidence. The SSA routinely contracts with psychologists such as Drs. Farmer and Fulmer, along with other mental health professionals, to evaluate a claimant's mental abilities and functional limitations addressing the effect of pain on mental functioning. *See Brandt* v. *Colvin*, No. 2:16-cv-4-FL, 2017 WL 499945, at *5–6 (E.D.N.C. Jan. 19, 2017) (holding that it was appropriate to remand a matter where ALJ assigned little weight to physiatrist's opinion because he was not qualified to make an assessment of the effect of claimant's pain on her mental functioning), *adopted by*, 2017 WL 507580 (Feb. 7, 2017); *Broussard* v. *Astrue*, No. 08-cv-961, 2009 WL 4929141, at * (W.D. La. Nov. 24, 2009) (finding psychologist entitled to opine of the effects of chronic pain and that ALJ reasons for erred in discounting opinions of psychologist because he was not a medical doctor); *Poff* v. *Barnhart*, No. 7:06-cv-429, 2007 WL 1168952, at *3 (W.D. Va. Apr. 18, 2007) (determining that the ALJ erred in discounting opinion of psychologist who suggested that claimant's pain and depression impaired his ability to focus); *Sparks* v. *Barnhart*, 434 F. Supp. 2d 1128 (N.D. Ala. 2006) (explaining that medical evidence of pain itself, or of its intensity, is not required to establish

---

[4] ALJ Watson gave some weight to Dr. Farmer's opinion that Edwards could understand, retain, and follow instructions and relate to others. Tr. at 22.

disability). Qualified mental health professional such Drs. Farmer and Fulmer are precisely the specialists to address the effects of symptoms on a claimant's mental functioning.

Thus, ALJ Watson has failed to articulate sound reasoning for consideration of Dr. Farmer's opinion. And ALJ Watson's error in evaluating Dr. Farmer's assessment was the basis to assign little weight to Dr. Fulmer's opinion, which renders his consideration of Fulmer's opinion similarly flawed. As a result, further consideration of the assessments of Drs. Farmer and Fulmer, with well-supported reasons for the weight the ALJ gives to them, is appropriate.

ALJ Watson also concluded that, lacking the disability paperwork, Richardson's opinion about Edwards's abilities and functional limitations was in his treatment notes rather than a separate medical statement. Tr. at 33. Upon remand, the ALJ must appropriately consider and weigh Richardson's assessments.[5]

But the court cannot find error with ALJ Watson's consideration of Baughton's June 2011 report which noted that Edwards had trouble breathing and sitting still, and appeared to be in significant pain. Tr. at 28. As a caseworker, Baughton does not qualify as an acceptable medical source. Even so, on remand, the ALJ may consider her statement may along with the other medical evidence.

Because additional evidence needed from Richardson may affect the consideration of the other medical opinions and the weight attributable to them, upon remand the ALJ should also reweigh the medical opinion evidence because of any new submissions into the record.

---

[5] Since ALJ Watson's decision, nurse practitioners such as Richardson are now considered "acceptable medical sources" for impairments within their licensed source of practice. *See* POMS DI 22505.003 Evidence from an Acceptable Medical Source (AMS).

### E.    Step Five

Edwards also challenges the ALJ Watson's identification of the relevant Grid Rule at step five. At the time of ALJ Watson's decision, Edwards was six months from moving into the next age category under the Grids. She argues that ALJ Watson mechanically applied the age categories in a borderline situation when considering whether she was disabled under the Grids. The Commissioner maintains that even if Edwards fell into a borderline age situation, she has failed to make a showing that justifies using a higher age category. This issue also warrant more consideration upon remand.

As noted above, while a claimant has the burden at steps one through four, it is the Commissioner's burden at step five to show that work the claimant can perform is available. *Pass*, 65 F.3d at 1203 (citing *Hunter* v. *Sullivan*, 993 F.2d 21, 35 (4th Cir. 1992)). "The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (Grids) or by calling a vocational expert [("VE")] to testify." *Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002) (citing 20 C.F.R. § 404.1566)). The Grids are published tables that take administrative notice of the number of unskilled jobs at each exertional level in the national economy. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a).

When a claimant suffers solely from exertional impairments, the Commissioner may rely on the Grids to satisfy its burden to present evidence about the availability of jobs the claimant can perform. *Grant* v. *Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983). But when a claimant: (1) suffers from a non-exertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional impairment which restricts him from performing the full range of activity covered by a work category, the ALJ must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant.

*See Walker* v. *Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *Hammond* v. *Heckler*, 765 F.2d 424, 425–26 (4th Cir. 1985); *Cook* v. *Chater*, 901 F. Supp. 971 (D. Md. 1995); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h).

The Regulations consider age to be a factor affecting the ability to make a vocational adjustment to other work in the economy. 20 C.F.R. § 404.1563. The Grids contain four age categories: (1) close to retirement age (60–64); (2) advanced age (55–59); (3) approaching advanced age (50–54); and (4) younger individual (18–49). For claimants "closely approaching advanced age" (age 50–54), age, along with a severe impairment(s) and limited work experience, "may seriously affect [the] ability to adjust" to other work, and for claimants of "advanced age" (55 and over), age "significantly affects a person's ability to adjust to other work." *Id.* § 404.1563(d)–(e).

In a "borderline situation," where the claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled," the Regulations provide that the age categories will not be mechanically applied. 20 CFR § 416.963(b). Instead, the SSA will "consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." *Id.* The ALJ need not automatically apply the older age category, *id.*, but must "find additional vocational adversities in RFC, education, or work experience (beyond those already considered in the rules) to support a determination to use the next higher age." Program Operations Manual System ("POMS") § DI 25015.005(D)(1).

ALJ Watson conducted the hearing on April 1, 2015, and he issued his decision on August 11, 2015. These dates are 188 days and 56 days, respectively, before Edwards's 55th birthday, an occasion which would have placed her in the "advanced age" category under the

Grid Rules.[6] Factoring in this higher age category with Edwards's RFC (light work), education (high school graduate or more), and past work (skilled or semi-skilled but skills not transferable[7]), Rule 202.06 requires a finding of "disabled."[8]

But instead of using the higher age category, ALJ Watson applied Edwards's chronological age, 54, and found that under Rule 202.14, a claimant closely approaching advanced age with the same RFC, education, and past work was not disabled. Tr. at 35. Other courts have found such facts require an explicit consideration of the borderline age category, and an ALJ's lack of discussion on the issue warranted remand. *See Phillips* v. *Astrue*, 671 F.3d 699 (8th Cir. 2012) (noting that ALJ's failure to note that he had considered whether a claimant falls within a borderline category and, if so, whether bumping the claimant up was warranted, constitutes a failure to offer findings of fact and reasons for his decision); *Daniels* v. *Apfel*, 154 F.3d 1129 (10th Cir. 1998) (finding borderline situation where claimant 65 days short of advanced age category); *Kane* v. *Heckler*, 776 F.2d 1130 (3d Cir. 1985) (remanding matter where claimant's insured status expired only 48 days before his 55th birthday and ALJ failed to consider regulation that age categories not be applied mechanically in a borderline situation); *see also Jackson* v. *Colvin*, 240 F. Supp. 3d 593 (E.D. Tex. 2017) (holding that remand was warranted where ALJ's decision stated that claimant was 54 years old on date last insured, without further explanation, because this was insufficient to demonstrate that ALJ recognized or considered claimant's borderline age situation, being within three months of his 55th birthday); *Discher* v. *Colvin*, 214 F. Supp. 3d 798 (D. Alaska 2016) (explaining that the ALJ should have

---

[6] Edwards met the insured status requirements through December 31, 2015. Tr. at 20.

[7] ALJ Watson's decision made no finding about whether Edwards had transferable job skills but determined that transferability of skills was not applicable to his decision. Tr. at 34.

[8] Edwards cites Rule 202.04 as the applicable Grid Rule. But as her past work was skilled or semi-skilled, not unskilled, Rule 202.06 is the appropriate Rule.

considered claimant's borderline age situation and, at a minimum, awarded claimant benefits as of his 55th birthday where claimant was four months short of his 55th birthday on day ALJ issued her decision).

The Commissioner contends that Edwards has not shown additional vocational adversities justifying the use of the higher age category. But the Fourth Circuit has recently cautioned, although in a different context, that "precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015); *see also Mitchell* v. *Astrue,* No. 3:10-cv-544, 2011 WL 5037134, at *3 (W.D.N.C. Oct. 24, 2015) (rejecting the Commissioner's argument that in a borderline situation a claimant must show the ALJ would have decided the case differently, because "[t]he Fourth Circuit regularly remands without such a showing of prejudice where the agency fails to abide by procedures required by its duly promulgated regulations.").

Given Edwards age at the time of the hearing and at the time of ALJ Watson's decision, coupled with the fact that she maintained insured status through her 55th birthday, the lack of discussion about the borderline age situation and the appropriateness of placing Edwards in the advanced age category suggests mechanical application of the age categories. The court cannot conclude that substantial evidence supports the step five finding where no discussion of the borderline age issue is evident. As a result, remand on this issue is appropriate.[9]

---

[9] Edwards also contends that ALJ Watson's hypothetical questions to the Vocational Expert ("VE") failed to include limitation for simple work and a restriction on exposure to pulmonary irritants. Although the first hypothetical questions did not reference simple work, the second hypothetical question included a limitations to simple, routine, repetitive tasks. The VE stated that an individual would be able to perform the jobs identified. Nor did Edwards's RFC contain a restriction on exposure to pulmonary irritants. Tr. at 25. In any event, two of the jobs identified by the VE—ticket seller and check room attendant—do not involve exposure to environmental conditions. *See* DOT 211.467-030 and 358.677-010. Thus, these positions would satisfy the

### III. Conclusion

For all these reasons, the court grants Edwards's Motion for Judgment on the Pleadings (D.E. 21), denies Berryhill's Motion for Judgment on the Pleadings (D.E. 25), and remands this matter to the Commissioner for further consideration. This action is dismissed. The Clerk shall close this case.

Dated: March 21, 2018.

_Robert T Numbers II_
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE

---

commissioner's step five burden even if Edwards's RFC had limited her exposure to pulmonary irritants.